<pre>
 1                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF TEXAS
 2                       HOUSTON DIVISION

 3   UNITED STATES OF AMERICA      .  CR. NO. H-16-408-7
                                   .  HOUSTON, TEXAS
 4   VS.                           .
                                   .  FEBRUARY 3, 2020
 5   CHARLES EARL GROB, JR.        .  10:25 A.M. to 10:56 A.M.

 6

 7                   TRANSCRIPT of SENTENCING
              BEFORE THE HONORABLE VANESSA D. GILMORE
 8                UNITED STATES DISTRICT JUDGE

 9

10   APPEARANCES:

11   FOR THE GOVERNMENT:            MR. JUSTIN R. MARTIN
                                    U.S. Attorneys Office
12                                  1000 Louisiana Street
                                    Suite 2300
13                                  Houston, Texas  77002

14

15   FOR THE DEFENDANT:             MR. JAMES MADISON ARDOIN, III
                                    Jimmy Ardoin & Associates,
16                                    PLLC
                                    4900 Fournace Place, 550
17                                  Houston, Texas  77401

18

19   OFFICIAL COURT REPORTER:       MS. KATHY L. METZGER
                                    U.S. Courthouse
20                                  515 Rusk
                                    Room 8004
21                                  Houston, Texas  77002
                                    713-250-5208

22

23

24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer-aided transcription.
</pre>

                        P R O C E E D I N G S

          *THE COURT:*  United of America versus Charles Grob.

               For the United States?

          *MR. MARTIN:*  Justin Martin for the United States.

10:25:19   *THE COURT:*  And then for the defendant then, please?

          *MR. ARDOIN:*  Good morning, Your Honor.  Jimmy Ardoin
on behalf of Mr. Grob, who's present in the courtroom.

          *THE COURT:*  All right.

          *THE DEFENDANT:*  Good morning, Your Honor.

10:25:29   *THE COURT:*  Good morning.  We're here this morning for
a sentencing.  Mr. Martin, did you see the presentence
investigation report and the addendum to that report?

          *MR. MARTIN:*  Yes, Your Honor.

          *THE COURT:*  And, Mr. Ardoin, have you and your client
10:25:48 had a chance to review the presentence investigation report as
well as the addendum?

          *MR. ARDOIN:*  Yes, Your Honor.

          *THE COURT:*  Then the presentence investigation report
and the addendum will be placed into the record under seal.  In
10:25:57 the event that there's any appeal of this case, the only
portion that will not be disclosed will be that portion that
contains a sentencing recommendation from the probation
department to the Court.

               There were no objections by the United States or
10:26:07 by the defense.  Mr. Ardoin, did you find any mistakes or

10:26:10  1  anything that could have an impact on sentencing?

2     *MR. ARDOIN:*  No, Your Honor.

3     *THE COURT:*  All right.  Then the Court adopts the

4  presentence investigation report and the addendum, finds that

10:26:17  5  the statutory range of punishment is not more than five years.

6  Supervised release, not more than three years.  Fine, not more

7  than 250,000.  Restitution undetermined at this date.  Special

8  assessment is $100.

9     Under the Sentencing Guidelines, based on a total

10:26:32  10  offense level of 33 and a criminal history category of I,

11  provides for a guideline range of 135 to 168, which becomes 60

12  months under 5G of the Sentencing Guidelines.  Supervised

13  release term of one to three years.  Fine range, 17,500 to

14  175,000.  Restitution undetermined at this time.  Special

10:26:57  15  assessment is $100.

16     All right.  Mr. Ardoin, what would you like to

17  say on behalf of your client, please?

18     *MR. ARDOIN:*  Yes, Your Honor.  I filed a sentencing

19  memorandum, which I'm sure the Court is aware of.

10:27:09  20     *THE COURT:*  Yes, I think I got it.  Yes.

21     *MR. ARDOIN:*  And I know it's a very aggressive request

22  in this case given the loss amount and everything, but I am

23  requesting probation.

24     *THE COURT:*  Yeah, I didn't get that.

10:27:18  25     *MR. ARDOIN:*  I know, Your Honor.

10:27:19  1      THE COURT:  I read it, and I was like why.  How is

2  this a probation case?

3      MR. ARDOIN:  I understand, Your Honor.  And I know

4  it's a --

10:27:25  5      THE COURT:  I mean, the guideline range is 135 to 168.

6  He's already getting a gift.

7      MR. ARDOIN:  I know.  I think you and I have been down

8  that road in cases before.

9      THE COURT:  Yeah.

10:27:33  10      MR. ARDOIN:  So I understand the Court's perspective

11  on that.  But I would direct the Court to the attachment to the

12  PSR, which was this sale of stock --

13      THE COURT:  Right.

14      MR. ARDOIN:  -- chart.  It's 50 million dollars' worth

10:27:45  15  of sale of stock.  Mr. Grob is not on it.  Not a single line of

16  this applies to Mr. Grob.  He never sold any stock.  He didn't

17  profit out of the stock sales.

18      THE COURT:  So, but you're saying that -- are you

19  trying to say he didn't profit at all?

10:28:01  20      MR. ARDOIN:  No, I'm not saying that.  I'm not saying

21  he didn't profit at all.  He was paid his salary.  He gained a

22  total of $242,000 --

23      THE COURT:  Right.

24      MR. ARDOIN:  -- as part of this.  And, you know, he

10:28:10  25  was brought into this by a close friend of his who was

associated with the group who was never charged.  Initially he
believed this to be a legitimate venture, but it turned out it
was not and he realized it was not, but he stuck with it.  And
there's no justification.  And he'll tell you there's no good
excuse for why he stayed in.  Whether he felt trapped or I know
the PSR recognizes he's had a lot of mental health issues and
substance abuse issues, whether those contributed to why he
stayed and needing the paycheck and the money, I'll let him
address that.

But the reality is if you look at the factual
allegations of what was laid out, he just did what everybody
told him to do.  There was no independent thought on his part
in terms of the press releases, in terms of the phone calls.
He was basically given a script by Mr. Farmer and Mr. Massey.
Those were the two.  In fact, there were -- and I don't think
it made it into the PSR, but there were several statements by
Mr. Massey where he even describes that, you know, Mr. Grob was
not -- he should have never even been the CEO.  That he was --
you know, he just did what we told him to do, that that was all
he was good for.  That Mr. Massey, in fact, felt that he should
be the CEO running the organization and doing everything,
because that's what he was essentially doing.

Now, Mr. Massey, of course, pled first.  He was
the first one to come in.  He did the deal pre-indictment.
Mr. Grob was the second one to plead.  He was part of the

10:29:45  1  second wave that came in.  And he was the first one of the

2  second group, the larger group to cut a deal, and he was ready

3  to come in and testify against everyone else.

4          So I think in terms of his role, he's clearly

10:29:58  5  less culpable than the others.  Far less culpable than the

6  others in terms of what he actually profited from them and what

7  he -- he was essentially, even though he knew what he was

8  doing, he was really a puppet at the end of the day, doing

9  what --

10:30:13  10          *THE COURT:*  You're saying his culpability is less

11  because he got less money?

12          *MR. ARDOIN:*  Well, I think that that's part of it.  I

13  think that part of it is he was also -- he was more of a, like

14  I said, just more of a -- someone who was directed on what to

10:30:31  15  do.  He knowingly did it.  There's no doubt about that.  And

16  he'll tell you that.  He knowingly did the sham investor

17  agreements.  He went out and they got him -- you know, they

18  asked him to go get his friends and family to do it, and that's

19  what he did.  There's no doubt about that.  And he got a lot of

10:30:48  20  people involved in this case and ruined a lot of friendships

21  because of it, with the SEC case and everything else.

22          I think that even though he had the title of CEO,

23  that's really not what he was.  Farmer and Massey were

24  effectively the CEOs running everything behind the scenes.  The

10:31:07  25  CEO title in his case is nothing more than them putting

10:31:13  1  somebody else out there to be -- you know, to kind of fly under

2  the radar undetected, if you will, until people started to

3  realize what was going on.

4          And as the facts would bear out, when FINRA

10:31:23  5  called, when everybody else called -- was making the calls to

6  Mr. Grob, he won't talk to them without first going to Massey

7  and Farmer and say, What do I say here?  What's going on?

8  That's, you know, that's when everything starts to really

9  unravel in terms of the whole scheme, if you will, is that he

10:31:41  10  starts getting calls from news outlets.  And he won't -- he

11  won't say anything to people without Massey or Farmer right

12  there by his side to answer those phone calls.

13          And so, yes, he had a role.  There's no doubt

14  about it.  But he was not, even though his title was CEO, he

10:31:58  15  was not the main person in this thing.  I think the sale of

16  stock bears that out.  50 million -- 50 million sales of

17  stock -- 50 million dollars' worth of sale of stock, he's not

18  on one single line of this.  And so that's just part of it, but

19  I think the other is --

10:32:14  20          *THE COURT:*  In terms of you mean having made money out

21  of it?

22          *MR. ARDOIN:*  Correct.

23          *THE COURT:*  But how many lines is he on it in terms of

24  which of these -- which companies he got investors to come in

10:32:28  25  and invest?

10:32:29   1          *MR. ARDOIN:*  So Chimera, which is the only one on this

2    list that he was involved with.  So it's 1, 2, 3, 4, 5, 6, 7,

3    8, 9, 10, 11, 11 lines on here.  And they're all Eddie Austin,

4    Scott Sieck, some other entities on behalf of those people or

10:33:06   5    on behalf of Andrew Farmer.  He wasn't associated with the

6    stock sales.  He was certainly associated with the pump and

7    signing the press releases, talking to the media, getting the

8    straw investors to help them even get to the IPO.  The straw

9    investors were all these people --

10:33:25  10          *THE COURT:*  What he did was an integral part of this

11   whole scheme.  Without his participation, the scheme wouldn't

12   have worked.  I mean, what he did in terms of --

13          *MR. ARDOIN:*  I agree with that, Your Honor, but I

14   think based upon the fact that essentially Farmer and Massey

10:33:40  15   were pulling the strings, it could have been anybody.  It just

16   so happened to be him.  It just so happened to be Mr. Grob.

17          *THE COURT:*  Which is why he's standing here.

18          *MR. ARDOIN:*  Correct.  But what I'm saying is, that he

19   was not an integral part.  They could have pulled this scheme

10:33:55  20   off with anybody else.  It wasn't --

21          *THE COURT:*  I know, but I mean in terms of his

22   involvement, I'm just talking about what he did.

23          *MR. ARDOIN:*  Right.

24          *THE COURT:*  He was an integral part of this whole

10:34:03  25   scheme.  If he hadn't done what he did, it wouldn't have

10:34:07  1   worked.  I mean, I'm only talking about what his role was --

2      *MR. ARDOIN:*  Completely agree, Your Honor.

3      *THE COURT:*  -- in this particular case, not the fact

4   that anybody could have done this.  You know, you could have

10:34:15  5   don it.  Anybody could have done it.

6      *MR. ARDOIN:*  Absolutely, Your Honor.

7      *THE COURT:*  But you didn't.

8      *MR. ARDOIN:*  Right.

9      *THE COURT:*  He's the one who did it.

10:34:20  10      *MR. ARDOIN:*  That's right.  And I'm not trying to --

11   I'm not trying to lessen his role.  I'm trying to distinguish

12   him from where the others are in this whole -- in this whole

13   thing.  And so I think that's where he stands in terms of the

14   overall role of the company.

10:34:33  15      Now, in terms of what he's done since this, which

16   I think also helps bear upon my request, is that he settled the

17   case with the SEC.  He's paid back almost half of what he

18   agreed to pay the SEC back at this point.  He's working with

19   the receiver to identify more assets to help satisfy that

10:34:55  20   judgment, which we're hopeful that that should be satisfied

21   soon.  There's a sale of a home, which should hopefully satisfy

22   that and also be used to go to further restitution in this

23   case.

24      I think the other things that he's done is he's

10:35:10  25   gone out and he's gotten -- he's been in treatment for alcohol.

10:35:14  1   He's been to AA.  He's been in mental health treatment.  He's

2   been in both of those.  And, also, he's set up a new company

3   where he's actually making a legitimate living for himself and

4   employing other people, as a general contractor.  And I know I

10:35:31  5   included letters from some of his customers, who know him to be

6   nothing but an honest and ethical businessman when dealing with

7   him.

8            And so I think in terms of what he's done since

9   this -- I mean, this -- he left in 2014, and the SEC case was

10:35:47  10   filed not long after that.  So he knew this day was coming,

11   Your Honor.  I mean, he knew that this was going to be the end

12   result.  Now six years later did he know that that -- that it

13   was going to be coming?  I probably think that he anticipated

14   it was going to be a lot sooner than six years from the SEC

10:36:04  15   falling in on everybody.  But in that six years time, he's done

16   everything that I think you could ask of somebody to do to turn

17   his life around and make the turn away from being a part of

18   illegal conduct and being a part of groups like this.  He's

19   gone out and he's set up a thriving new business, helping

10:36:23  20   people during -- after Hurricane Harvey.  I mean, I think that

21   he has -- he has really shown what we want of everybody who

22   goes through this system, and that is, to turn their life

23   around.

24            And I know it's a big request to go from what

10:36:44  25   would be an over ten-year sentence down to probation, that he

10:36:49   1  pled to the original count, I realize that.  But I think that

2  there are characteristics of him that warrant consideration for

3  it.

4            THE COURT:  Mr. Grob, what would you like say on your

10:37:10   5  own behalf, sir?

6            THE DEFENDANT:  Your Honor, I'm truly sorry for all of

7  the pain that my actions have caused.  The pain that it has

8  caused those who lost money because of my actions.  The pain

9  that it has caused my family, including my mother and my uncle,

10:37:24  10  who are here today.  And to those who were once my friends, who

11  I involved in this scheme and I'm sorry that I dragged their

12  names through this mess.  Like Jimmy said, I got --

13            THE COURT:  Did you recruit friends and family to be

14  investors in this, too?

10:37:43  15            THE DEFENDANT:  It was a different -- it was

16  considered -- it's not selling stock on the open market.  It's

17  very small amounts, maybe a couple hundred dollars here and

18  there is what it was.  At this point in time, I thought this

19  was a legitimate investment.

10:37:57  20            THE COURT:  So is that a "yes"?

21            THE DEFENDANT:  Yes.  Yes.

22            THE COURT:  Okay.  Okay.

23            MR. ARDOIN:  And if I may pause there, Your Honor,

24  this was -- they needed these investors to be able to take it

10:38:06  25  to an initial public offering.  And he didn't understand how

10:38:11  1   this all worked until he later looked at it and saw that what

2   he had done was -- with regard to that was incorrect and -- but

3   he still continued to sign these press releases and everything

4   else.  So that's how this whole thing came about, was they

10:38:26  5   needed a certain number of investors in order to take the

6   company public.  And so he recruited --

7           THE DEFENDANT:  Right.

8           MR. ARDOIN:  -- friends and family to become those.

9   And that's what they refer to as the straw investors, Your

10:38:36  10  Honor.

11          THE DEFENDANT:  And none of those investors lost money

12  or anything like that in that particular stage of the

13  investment process.

14          THE COURT:  I'm sorry.  Speak up.

10:38:43  15          THE DEFENDANT:  None of those friends and family --

16  none of those S-1 and early investors were harmed financially.

17          THE COURT:  Oh, okay.

18          THE DEFENDANT:  Like Jimmy said, I got in this ordeal

19  by trusting one of my closest friends going back to Boy Scouts,

10:38:58  20  since we were knee high.  I did not come into it with the

21  intention of committing a fraud.  Somewhere along the way, I

22  should mention, things kind of became apparent, not overnight,

23  through a series of events, that this was not a legitimate

24  endeavor.  And this is when I kind of freaked out and felt

10:39:19  25  stuck.  I was the CEO of this company.  I didn't know what else

10:39:22   1   to do.   I was assured by the others that everything was

2   legitimate.   And then, you know, I didn't -- I stayed there,

3   and that's the biggest mistake I made.   I own that.   I should

4   have cut and run for the hills and not listen to what I wanted

10:39:38   5   to believe.   I should have seen the light and run the other way

6   and --

7        THE COURT:   Why didn't you?

8        THE DEFENDANT:   I don't have a good excuse, other than

9   the fact that I was trapped -- I felt trapped.   I didn't know

10:39:51  10   what to do.   I should have.   That's a mistake of mine.   I own

11   that.   I'm here to own that mistake.   That was, like I said,

12   probably the worst decision of my life.

13        And I've known this day has been coming six,

14   sevens years, since the SEC came in.   During this time I've

10:40:10  15   dealt with many hardships, including the death of my father and

16   my grandfather.   I'm divorced because of this.   My reputation

17   and many of my personal relationships are just destroyed.

18        I understand asking for probation is a big

19   request in light of these allegations and I know it's not

10:40:31  20   something that is handed out often in federal court.   But I

21   want the Court to know that I have been doing everything in my

22   power to better my life and do what I set out to do after I

23   graduated the business school of fraud, joined this group,

24   which is running a successful start-up company.   Over the past

10:40:48  25   five years, I've done just that.   Now I have clients and

10:40:51   1   workers that do depend on me on a daily basis.  I'm afraid that

2   incarceration will destroy all the efforts that I put forth.

3   While I'm hoping for probation, no matter what, I have turned

4   my life around and I will never involve myself in any kind of

10:41:05   5   conduct or associate with any types of people of this nature

6   again, I promise you that.

7        THE COURT:  Mr. Martin, anything from the United

8   States?

9        MR. MARTIN:  I agree with the defense that some of

10:41:30   10   these enhancements may not be capturing the true culpability of

11   the defendant.

12        THE COURT:  Like what?

13        MR. MARTIN:  The officer, director enhancement.  I

14   think that, as a plus four enhancement, I think that is sort of

10:41:43   15   meant in a situation where the defendant is taking a leadership

16   type of role in the company.  Whereas in this situation this

17   defendant was clearly not in a leadership position.  He was

18   following instructions of the other defendants.

19        THE COURT:  Okay.

10:41:58   20        MR. MARTIN:  The prior order enhancement, he had left

21   the conspiracy -- that's capturing the fact that it was -- that

22   if the crime was in violation of some prior judicial order, you

23   get the two-level enhancement.  The only -- the Chimera SEC

24   injunction came after he left the conspiracy.  The injunction

10:42:27   25   for Chimera was entered in 2015, but this defendant left in

10:42:32  1    2014.  There were two prior injunctions for Solar America.  I

2    did not see any evidence in this case that he was aware of

3    those injunctions against Eddie Austin and Carolyn Austin.  He

4    may have been, but I don't have any evidence of it.  So I'll

10:42:49  5    just --

6         THE COURT:  Are you talking about the offense

7    characteristic in Paragraph 82?

8         MR. MARTIN:  Yes.

9         THE COURT:  Okay.

10:42:57  10        MR. MARTIN:  So his conduct did come after an SEC

11    injunction against Eddie Austin and Carolyn Austin for Solar

12    America.

13         THE COURT:  Uh-huh.

14        MR. MARTIN:  I just didn't see any evidence that he

10:43:11  15    was aware of that, because he wasn't in the inner circle of the

16    defendants.  He wasn't a partner in the organization.  And I've

17    seen -- and what I was going to discuss was that one of the

18    things I noticed when I was prosecuting this case is that this

19    defendant is, my position and the position of the United

10:43:30  20    States, is certainly the least culpable defendant of all the

21    defendants that were charged in this case.

22         THE COURT:  So he made the least money too, I guess,

23    huh?

24        MR. MARTIN:  Yes.

10:43:41  25         THE COURT:  It guess that kind of goes hand in hand,

10:43:42  1    huh?

2        *MR. MARTIN:*  Yeah, he was -- he was just given a flat

3    salary.  He was not a decision-maker.  He was following the

4    instructions of the other defendants.  And, again, not in the

10:43:51  5    inner circle, so he was definitely kept in the dark on some

6    aspects of the fraud, particularly the foreign aspects.  I see

7    no evidence that he was aware of all the foreign accounts and

8    the foreign nominees that the defendants were using.

9            In light of those factors and in my view that

10:44:13  10   some of the enhancements may not be as applicable, I don't

11   think it's as much of a departure as it would be otherwise.  My

12   recommendation is a sentence below 60 months, and I would

13   recommend 36 months.

14       *(Judge conferring with the probation officer at the bench,*

10:44:37  15   *off the record.)*

16       *THE COURT:*  All right.  The Court will state the

17   sentence at this time.  The lawyers will have a final

18   opportunity to make any objections before the sentence is

19   imposed.

10:46:40  20          It is the judgment of this Court that the

21   defendant, Charles Grob, is hereby committed to the custody of

22   the Bureau of Prisons to be imprisoned for 12 months and 1 day.

23          The defendant stands before this Court having

24   entered a plea of guilty to conspiracy to commit wire fraud.

10:46:55  25   His involvement lasted from 2011 through 2014.  The criminal

10:47:02   1   scheme perpetrated by the defendant and his accomplices

2   centered on securities fraud and defrauded -- that defrauded

3   investors of their money by fraudulently manipulating the

4   market price and demand for various microcap securities

10:47:17   5   commonly referred to as penny stocks, which after being

6   artificially inflated were dumped for financial gain.

7           Although the defendant and his accomplices

8   profited, the security investors lost millions.  The defendant

9   was listed as the CEO of Chimera Energy in 2011, and his role

10:47:39   10   was to follow the instructions that were given to him by the

11   group's partners, which included approving press releases and

12   spreading company -- spending company money on expenses

13   approved by the group and issuing stock to investors as

14   directed by the group and signing contracts and agreements when

10:47:57   15   instructed by the group.  And while he was involved in

16   preparing false press releases, his accomplices funded a false

17   advertising campaign to fraudulently inflate the price of

18   securities.  He also assisted in recruiting straw investors in

19   furtherance of this scheme.

10:48:16   20           However, the Court would note that the

21   defendant's role in this scheme was much more limited than his

22   accomplices and, in fact, that he was directed by his

23   accomplices with respect to all of his activity and

24   additionally, that while all the other accomplices were

10:48:42   25   directly profiting from the sale of the stock, that during the

entire time that this scheme was taking place, that the -- that

this defendant received a very modest salary for the work that

he was doing, which is in contrast to the multiple millions of

dollars that were made by all of the other defendants.  This

defendant was paid a salary that fluctuated from 2500 to $5,000

a month.  However, during the period of time that this

defendant and his accomplices were involved, they defrauded

investors of $15,604,637.20.  Grob was paid a total of $242,000

as compensation for his role in this conspiracy.

He faced a much larger guideline range having

been convicted of all of the counts; however, he was permitted

to plead to one count with a maximum custody period of no more

than five years.

The Court does not believe that a sentence of

probation is sufficient, but believes that a sentence of 12

months and 1 day will impress upon this defendant the

seriousness of his conduct, the harm he caused to society, and

also provide just punishment for his actions, provide

deterrence, and promote respect for the law.  This sentence is

considered sufficient and necessary but not greater than

necessary to comply with the purposes and provisions of 18

U.S.C. Section 3553(a).

Upon release from imprisonment, the defendant

shall be placed on supervised release for a term of three

years.  A term of supervised release is mandated in this case

given the expected restitution payment to be due in this case.

Within 72 hours of release from the custody of the Bureau of Prisons, the defendant shall report in person to the probation office in the district to which the defendant is released.

While on supervised release the defendant must participate in an inpatient or outpatient alcohol abuse treatment program and follow all of the rules of the treatment program.  The probation officer will supervise the duration, modality, provider, and location of the program as well as its intensity.  You must pay the cost of the program if financially able to do so.

You must not use or possess alcohol.

You must pay the financial penalty imposed in accordance with the schedule that will be entered in this case.

You must submit to substance abuse testing to determine if you've used a prohibitive substance.  And you must pay the cost of testing if financially able to do so.

You must participate in a mental health treatment program and follow the rules and regulations of that program. The probation officer in consultation with the treatment provider will supervise your participation in the program, including the provider location, modality, duration, and intensity.  You must pay the cost of the program if financially able to do so.

10:52:05   1          You must take all mental health medications that
       2   are prescribed by your treating physician.  You must pay the
       3   cost of the medication if financially able to do so.
       4          You must provide the probation officer with
10:52:16   5   access to any requested financial information and authorize the
       6   release of any financial information.  The probation office
       7   will share that information with the U.S. Attorneys Office.
       8          You are prohibited from possessing any credit
       9   access devices, like a credit card, unless you are authorized
10:52:32  10   by the probation officer.
      11          You must not engage in any occupation, business,
      12   profession, or volunteer activity that would require and enable
      13   you to have fiduciary responsibility without the prior approval
      14   of the probation officer.
10:52:43  15          You're further ordered to pay to the United
      16   States a special assessment of $100 due and payable
      17   immediately.
      18          The Court finds that the defendant does not have
      19   the ability to pay a fine in addition to the restitution.  The
10:52:53  20   Court reserves the right to make a final determination on
      21   restitution and amend the judgment to include the restitution
      22   amount as soon as it is reasonably able to do so.
      23          The defendant shall make a lump sum payment of
      24   $100 due and payable immediately.  The balance due will be
10:53:11  25   payable at the rate of $25 per quarter or 50 percent of any

10:53:15  1  wages while in prison in accordance with the Bureau of Prisons

2  Inmate Financial Responsibility Program.  Any balance remaining

3  after release from imprisonment shall be paid in equal monthly

4  installments of no less than $100 per month to commence 60 days

10:53:29  5  after the date of release to a term of supervision.  Payment is

6  to be made through the United States District Clerk's Office,

7  Southern District of Texas.

8              Mr. Martin, do you know of any reason why the

9  sentence should not be imposed as stated?

10:53:41  10         *MR. MARTIN:*  Only requesting that the Court also make

11  the money judgment part of the sentence and include it in the

12  judgment.

13             *THE COURT:*  Okay.  The money judgment.  And then what

14  did I -- I don't remember how much it was.

10:53:51  15         *MR. MARTIN:*  In this case I believe it was not an

16  exact amount, but it was like 242,000.

17             *THE COURT:*  Did I sign it already?

18             *MR. MARTIN:*  Yes.  It's already been signed.

19             *THE COURT:*  Well, let me find it.  Hold on.

10:54:02  20      *(Judge conferring with case manager.)*

21             *THE COURT:*  I don't know if it's part of the sentence

22  or not.  I don't know how that works.  But -- oh, it doesn't

23  say.  Do you know?  Can you see what it is, Byron?  Can you

24  look at it?

10:54:23  25      *(Judge conferring with case manager.)*

10:54:33   1       *THE COURT:*  And the Court will make the previous

2  judgment entered in this case, money judgment, for $242,907.90

3  a part of the judgment in this case.

4       Mr. Ardoin, do you know of any reason why the

10:54:47   5  sentence should not be imposed as stated?

6       *MR. ARDOIN:*  No, Your Honor.

7       *THE COURT:*  Then the sentence is imposed as stated.

8       Mr. Grob, you can appeal your conviction if you

9  believe that your guilty plea was somehow unlawful or

10:54:57   10  involuntary or if you think that there was some other

11  fundamental defect in the proceedings that was not waived by

12  you.  However, a defendant can waive his right to appeal as

13  part of a plea agreement and you entered a waiver of your right

14  to appeal.  Those waivers are generally enforceable.  If you

10:55:13   15  think yours is unenforceable for some reason, you can present

16  that theory to the Court of Appeals.  With few exceptions, any

17  notice of appeal must be filed within 15 days of the date that

18  judgment is entered in this case.

19       Do you understand me, sir?

10:55:25   20       *THE DEFENDANT:*  Yes, Your Honor.

21       *THE COURT:*  If you're without funds to pay the costs

22  of an appeal, you can apply to the Court for in forma pauperis

23  status and counsel will be appointed for you.  Do you

24  understand?

10:55:34   25       *THE DEFENDANT:*  Yes, Your Honor.

10:55:35   1              *THE COURT:*  Anything else?

           2              *MR. MARTIN:*  Only the motion and proposed order for

           3    dismissal of the remaining counts.

           4              *THE COURT:*  Okay.  Anything else for the defense?

10:55:56   5              *MR. ARDOIN:*  If the Court would entertain making a

           6    recommendation to the B.O.P. for either Bastrop or Beaumont.

           7              *THE COURT:*  Okay.

           8              *MR. ARDOIN:*  And also if you would --

           9              *THE COURT:*  You don't want to just stay downtown?  He

10:56:07  10    can stay downtown, if he wants to.

          11              *MR. ARDOIN:*  I don't think so, Your Honor.

          12              *THE COURT:*  It's the further recommendation that the

          13    defendant be incarcerated at Bastrop or Beaumont during his

          14    term of imprisonment.

10:56:14  15                   Anything else?

          16              *MR. ARDOIN:*  Also, I assume, he's going to be allowed

          17    to self report on designation?

          18              *THE COURT:*  Mr. Martin, any objections?

          19              *MR. MARTIN:*  No objection.

10:56:21  20              *THE COURT:*  All right.  Same conditions of release,

          21    sir.  Have you had any new law violations since you've been on

          22    bond?

          23              *THE DEFENDANT:*  No, ma'am.  No, Your Honor.

          24              *THE COURT:*  Why did you look at your lawyer?  You

10:56:32  25    weren't sure?

10:56:33  1        *THE DEFENDANT:*  No, Your Honor.

2        *THE COURT:*  What was that?

3        *THE DEFENDANT:*  I didn't hear your question.

4        *THE COURT:*  Okay.  Have you committed any more

10:56:46  5   crimes --

6        *THE DEFENDANT:*  I like to run everything by my

7   attorney.

8        *THE COURT:*  Okay.  Have you committed any more crimes

9   since you've been on bond?

10:56:48  10        *THE DEFENDANT:*  No, Your Honor.

11        *THE COURT:*  All right.  Thank you.  Y'all are excused.

12        *MR. ARDOIN:*  Thank you, Your Honor.

13     *(Concluded at 10:56 a.m.)*

14                          * * *

15   I certify that the foregoing is a correct transcript from the

16   record of proceedings in the above-entitled cause, to the best

17   of my ability.

18

19   /s/ *Kathy L. Metzger*                    *2-26-2020*

20   Kathy L. Metzger                      Date
     Official Court Reporter

21

22

23

24

25